DECISION
Plaintiff appeals the 2006-07 real market value of improvements identified as Accounts 05008964 (Tax Lot 100) and 05003168 (Tax Lot 3600) and the 2007-08 real market value of improvements identified as Tax Lots 100 and 3600 and Account 05008987 (Tax Lot 2400).
A trial was held in the Oregon Tax Courtroom, Salem, Oregon on August 29, 2011, and August 31, 2011. Donald Grim, Attorney at Law, appeared on behalf of Plaintiff. Sonya Johnson (Johnson), Plaintiffs Controller and John Taylor (Taylor), broker and certified appraiser, testified on behalf of Plaintiff. Kathleen Rastetter, Senior County Counsel, appeared on behalf of Defendant. Cheryl Gordon (Gordon), MAI, Oregon and Washington certified general appraiser and Clackamas County Staff Appraiser, testified on behalf of Defendant. Parties stipulate that Taylor and Gordon are expert witnesses.
Plaintiffs Exhibits 1, 2, 3, and 8 through 13 were received without objection. Defendant's Exhibits A through K were received without objection.
Defendant's Trial Memorandum, filed August 26, 2011, included a motion in limine. Because Plaintiff did not offer into evidence the exhibits that were the subject of Defendant's motion in limine, Defendant's motion in limine is moot. *Page 2 
 I. STATEMENT OF FACTS
The parties agree that Tax Lot 100 is 18 townhome units located on .9 acres; Tax Lot 3600 is a 208 unit apartment complex located on 12.10 acres; Tax Lot 2400 is "six single level units" located on .42 acres and described by Gordon as "condominium quality." (Ptf's Ex 2-2; Def's Ex C-1). The 208 apartments were built in 2005 to 2007 and are located in 20 two-story wood frame buildings that have "one, two and three bedroom units with [a] total net rentable area of 191,624 [square feet]." (Def's Ex A-1.) The apartment amenities include parking ("surface, covered and garage"), "[d]eck or patio, appliances, microwave, washer and dryer, access to clubhouse and outdoor pool. Some units have vaulted ceiling, gas fireplaces and window seats." (Ptf's Ex 2-4; Def's Ex A-1.) Gordon testified that the six "condo good quality" units have "granite counter tops" and, depending on the number of bedrooms, a unit either has a "single or double-car garage."
The parties stipulate that as of January 1, 2006, Tax Lots 100 and 3600 were 40 percent complete; Tax Lot 3600 was 60 percent complete as of January 1, 2007; and Tax Lots 100 and 2400 were 100 percent complete as of January 1, 2007.
All tax lots are located in "planned development residential zoned land (PDR)" in Wilsonville, Oregon. (Def's Ex iii.) Taylor testified that because "zoning allows for the construction of condominiums and row houses[,] * * * the construction of an apartment building is not the highest and best use of the land as vacant, as of the date of the appraisal." (See Ptf's Ex 2-7.) Taylor testified that "[t]he land sales indicate that condominiums, or, possibly, upscale row houses, as in land sale #3 would have been a better use, at the date of the appraisal." (Id.) He testified that the subject property's location and access to restaurants and retail and the "I-5" interstate highway contribute to its overall desirability. Taylor testified that *Page 3 
as of the assessment date, January 1, 2006, land sales for condominium projects "were on fire" and the 12.10 acre lot was "highly desirable for condominiums." In response to questions about the consistent use principle, Taylor stated vacant land can be valued for a different use than developed land and as of the date of assessment the subject property's improvements had less value as apartments than condominiums. Defendant reminded Taylor that the subject property's developer never applied to build condominiums on the tax lots under appeal. Taylor responded that "condominium development" was allowed in the "master plan." Gordon testified that the "condominiums would be legal if the developer got approval, but the developer never did" seek such approval.
In contrast, Gordon testified that "[b]ased on the preceding criteria [legally allowed, financially feasible and maximally productive] the Highest and Best Use of the subject property (as vacant) as of the three dates of value, January 1, 2007, (sic), 2007 and 2008, is multifamily apartment development." (Def's Ex A-38.) Gordon reached the same conclusion for the subject property as improved. (Id. at 39.) Gordon testified about the housing market in general, stating that for all three years under appeal the "apartment market was strong" whereas the condominium market was strong in 2006 and 2007, but "declined pretty quickly" in 2008. (Def's Ex A-8-13.)
1. Tax Lot 3600 — Assessment date: January 1, 2006
a. Sales Comparable Approach — Land Real Market Value
Both appraisers used the sales comparables approach to determine the overall land real market value. (Ptf's Ex 2-8-13; Def's Ex A-41-46.) Each appraiser first determined the real market value of land vacant and to that vacant land value added on-site development costs (OSDs) to determine a total real market value of land as improved. In valuing the land, Gordon *Page 4 
valued each of the three parcels, 12.10 acres, .89 acres and .42 acres, individually. (Def's Ex A-41; B-34; C-35.) Taylor determined a price per unit and price per square foot for the 208 apartment units and ultimately relied on price per unit to determine the real market value of raw land for the 12.10 acre parcel. (Ptf's Ex 2-10, 13.) In response to questions, Taylor testified that he did not use different land sales to determine a raw land value for the two other smaller tax lots.
Taylor and Gordon testified in detail about their comparable land sales and were extensively questioned about the comparability of the selected properties to the subject property. Both appraisers concluded that two land sales, identified as Hawks Ridge Apartments (11.60 acres) and Villebois Village Center (9.40 acres), were comparable to the 12.10 acre parcel. (Ptf's Ex 2-9; Def's Ex A-42.) Taylor testified that, even though Hawks Ridge Apartments and Villebois Village Center are closer in size to the 12.10 acre parcel, those parcels are "several miles away from commercial centers and from close access to freeways." He testified that the Hawks Ride Apartments site was "vastly inferior to subject" and Villebois Village Center was "pretty rural, not within walking distance of shopping and restaurants." (Ptf's Ex 2-8.) When questioned, Taylor conceded that Villebois Village Center is "1 ½ miles" from the subject property," giving it the same access to "commercial and I-5" as the subject property, but it is "not within walking distance of stores, fitness center and commercial." Gordon testified that Villebois Village Center is a "master plan development, having condominiums, apartments and commercial."
Taylor testified that the 12.10 acre parcel "compares favorably with both Sales #3 [Village at Main, 3.09 acres] and #4 [Eagle's Loft Condominiums, 7.91 acres] with easy access to shopping as well as freeway access." (Id. at 2-8 — 9) In response to questions stating that *Page 5 
Sales #3 and #4 "were finished lots," Taylor testified that he was unaware that prior to date of sale Eagle's Loft was "platted for 128 condominium units and infrastructure was in place." Taylor stated that the "utilities could have been like Phase II — up to the property line but not extending into the land." Taylor testified that Village at Main was a "portion of the same overall development" with 53 condominium units. Gordon testified that at the date of sale for Village at Main "there were several finished lots" and it was "platted and divided into smaller lots," giving it "different characteristics than the subject property." Taylor determined a range of value per unit of $15,132 to $67,500 and concluded an "estimated value of subject per unit" of $40,000 or $8,320,000 for the 12.10 acre parcel "without OSDs. (Ptf's Ex 2-13.)
Gordon testified that "[p]arcel size is a critical element of comparison" in determining the real market value of raw land. (Def's Ex A-45.) Gordon's five comparable sales ranged in size from 9.30 to 19.40 acres. (Id.) She testified that "[a]ll comparable sales are located within active developing submarkets within the Portland metro area[]" and "[t]he comparables are zoned for medium to high density residential development, to include attached dwelling in either townhouse or stacked formation and either apartments or condominiums." (Id.) Gordon testified that "[o]n a price per unit basis, the comparable sales range from $11,779 to $19,324 per unit[,]" indicating "a reasonable and tight range of value." (Id. at A-45, 46.) Gordon testified that "a price per unit value of $19,000 per unit is concluded for the subject property[]" and when "[a]pplied to the 208 allowed units results in a land value conclusion of $3,952,000."[1] (Id.)
Each appraiser agreed that it was "appropriate" to add OSDs to the raw land value. Both appraisers accepted "[t]he following statement of actual on-site and off-site costs of OSDs" * * * *Page 6 
provided by Robert Johnson, Manager of Village at Main Street, Phase II LLC." (Ptf's Ex 2-14; Def's Ex A-100.) Johnson testified that the costs were incurred for 302 units, including 70 condominiums. Even though the appraisers agree that all of the costs labeled "off site costs," and underground construction costs, and some of the on-site costs, including civil engineering fees, excavation, landscaping, survey, are allowable OSDs, the appraisers dispute that the total amount of municipal development fees are allowable OSDs and can be added to the raw land value. (Ptf's Ex 2-14; Def's Ex A-100.) Taylor testified that Oregon Administrative Rules (OAR) 150-303.415 and 150-307.100 allow the disputed municipal development fees to be added to the raw land cost. Because the total OSDs ($7,208,509) are for 302 units, Taylor allocated the cost based on the 208 units built on Tax Lot 3600 for total OSDs of $4,960,000 (rounded). (Ptf's Ex 2-15.) When this amount was added to Taylor's real market value of raw land, he determined a total land value of $13,280,000 for Tax Lot 3600 as of January 1, 2006. (Ptf's Ex 2-16.)
Gordon testified that she concluded only $4,213,409 of the total OSDs ($7,208,509) are allowable OSDs that can be allocated on a per unit basis ($13,952) and added to the raw land cost. (Def's Ex A-47.) Gordon testified that the municipal development fees that she did not attribute to the land are "clearly required for the development of the 207 (sic) units," but "are more accurately classified as indirect, or `soft' construction costs relating to the buildings and proposed occupancy." (Id.) In her opinion, Gordon concluded that the municipal development fees "go into the city's infrastructure," not the subject property's. Gordon agreed that those "costs" are collected at "the time of obtaining a building permit" but she concluded that those costs should be "recognized as building rather than land development costs." Gordon concluded that "[b]ased on the 208 units * * *, the indicated site development cost is $2,901,951. (Id.) *Page 7 
Gordon added the determined OSDs to the raw land value for a total real market value of $6,854,000 for Tax Lot 3600.[2] (Def's Ex A-48.)
Taylor was questioned about the OSDs costs. Taylor testified that, in his opinion, the "on-site development costs are comparable for each tax lot even though the type of building" (apartment, condominium, townhouse) "is different." Taylor testified that, even though "the density is different," he assumed "the costs are consistent because it is one big development."
b. Sales Comparable Approach — Real Market Value
To determine the real market improvement value, both appraisers used the sales comparable/comparison approach or market approach. (Ptf's Ex 2-16; Def's Ex A-71 — 81.) Taylor used the sales comparable approach to determine a real market value as of January 1, 2006. Gordon used the sales comparable approach to determine a real market value of January 1, 2008. For tax year 2006-07, Gordon concluded that because "no units were rentable and no income was being earned, * * * neither the Income Capitalization Approach nor the Sales Comparison Approach is applicable." (Def's Ex A-84.)
Taylor testified that he selected five comparable properties that sold in early 2003 to mid-2006. (Ptf's Ex 2-18.) His appraisal report stated that two comparable properties (Sale #1 and Sale #4) were located in Wilsonville and the other properties were located in Gresham (Sale #2), Fairview (Sale #3), and Hillsboro (Sale #5.) (Id.) Taylor testified that the location of comparable properties identified as Sales #3, #4, and #5 are "inferior" or "somewhat inferior" to the location of the 208 units at issue. Taylor testified that he was unaware that Sale #4 is "located on the other side of or behind a Thriftway store." Two comparable properties (Sales #1 and #5) selected by Taylor have units of 266 and 360, respectively, and were built in 1996. (Id.) *Page 8 
In response to questions, Taylor testified that he had no knowledge that Sale #5 "resold" in 2007 for "34%" more than its previous sale price and he agreed that a "2007 sale would be a good indicator of value." The unit size of Taylor's five comparable properties ranged from 111 units to 360 units, resulting in a range of sale price per unit of $64,286 to $86,806. (Id.) Taylor testified that he concluded a price per unit of $87,000, relying on the "ranking method," stating that it is "where on the table the subject property fall[s]." He determined a total real market value of $18,096,000. (Ptf's Ex 2-20.)
In determining a real market value using the comparable sales approach, Taylor considered price per square foot. (Id.; Def's Ex A-74, 79-80.) Taylor's appraisal report states that "[c]omparing the units on a square foot basis gives a somewhat different result. * * * On the per unit basis, having a larger size is a good thing, drawing more rent per unit than a smaller apartment unit. On a per square foot basis, * * * a smaller apartment is able to produce more rent per square foot than a larger unit, other things being equal." (Ptf's Ex 2-20.) Taylor computed price per square foot for his five comparable sales ranging from $58.44 to $92.95. (Id.) Concluding a "value per square foot" of $92, Taylor computed a "[t]otal [v]alue of $17,511,648." (Id.) Taylor reconciled the price per unit value and price per square foot value, concluding a "[t]otal value per market approach" of "$18,000,000." (Ptf's Ex 2-21.)
3. Income Approach — Real Market Value
Both appraisers used the income approach to determine real market value. (Ptf's Ex 2-21 — 30; Def's Ex A-56 — 70.) Taylor used the income approach to determine a real market value as of January 1, 2006. Gordon used the income approach to determine a real market value of January 1, 2008. For tax year 2006-07, Gordon concluded that because "no *Page 9 
units were rentable and no income was being earned[,] * * * neither the Income Capitalization Approach nor the Sales Comparison Approach is applicable." (Def's Ex A-84.)
Even though the appraisers used the income approach to determine real market value for different tax years, the appraisers agree that the starting point is the determination of gross potential income or gross projected rent. (Ptf's Ex 2-21; Def's Ex A-56.) Taylor testified that "[t]o make this estimation, [he] looked at Phase [I] of the same complex[,]" because Phase I was "232 units in the same complex for same time period." (Ptf's Ex 2-21.) Johnson testified that the "rents" for Phase II in 2006, 2007 and 2008 were "approximately the same as the rents in Phase I." In his appraisal report, Taylor stated that:
 "For Phase One, individual contract rents are used whereas for Wilsonville Summit and Canyon Creek the shop rate is used. Shop rate is the exact rate quoted by the leasing agent to the person making the survey.
 The rates are quoted below and a per square foot price is computed."
(Id.) Taylor computed rent per square foot was applied to the square foot of the actual number of one and two bedroom apartments to determine a monthly rent and finally a total annual rent of $1,936,862 if all 208 units were available for rent as of January 1, 2006. (Id. at 24.) In response to questions, Taylor testified that he did not know that "there was a rent study on the property." Johnson testified that she had no "knowledge" if Marathon Management, her employer, "was involved in a rent study." Taylor testified that he did not use "the actual rent [received] for the subject property;" he testified that he "used rents available at 2006 for Phase I and applied [them] to Phase II." To the total annual rent, Taylor added "Other Income" in the amount of $49,248. (Id.) When asked to list the type of income included in other income, Taylor responded that it was income from renting garages and use of the laundry by the tenants and he admitted that he "could not locate the source data." Taylor testified that he was "unaware that utility charges were collected from the tenants." *Page 10 
Next, Taylor testified that he determined a vacancy rate and bad debt loss because "[a]n apartment is seldom entirely full and not all tenants pay as they have agreed to." (Ptf's Ex 2-25.) Taylor considered the "vacancy information from buyers, sellers and, managers of the various properties[]" that supplied information to Costar, a "multifamily market report * * * for the Wilsonville area," the "actual vacancy as of the appraisal date" for Phase I of the Village at Main, and "[t]wo other complexes [Sandalwood Apartments and Willow Creek Apartments] for which operating statements were available[.]" (Ptf's Ex 2-25 — 26.) Taylor testified that he concluded that nine percent was "a reasonable estimate of vacancy and bad debt loss." (Id. at 26.) In response to questions, Taylor testified that it is difficult to get bad debt loss information from property managers. Johnson testified that the vacancy rate for Phase I was "13-14 percent" in 2006 and "8 percent" in 2007. She testified that the vacancy rate did not "include bad debt allowance." Gordon testified that she made no adjustment for credit loss because "there is no evidence that the property is suffering from bad debt loss."
After determining the vacancy and bad debt loss, Taylor determined "[e]xpenses, excepting taxes were estimated on a line by line basis using a sister complex, Village at Main Phase [I] as a guide." (Id.) Johnson testified that the actual expenses of Phase II are "substantially identical" to those of Phase I. Taylor computed an expense per square foot for the following expense categories: employee; administrative; marketing; utility; maintenance; and insurance. (Id. at 27.) He multiplied each computed expense per square foot times 190,344 square feet to determine a total expense per category and summed the categories to compute total expenses excluding property taxes of $664,300. (Id. at 28.) *Page 11 
Taylor's appraisal report stated that "[p]roperty taxes are often 20 to 25 percent of the total expenses [and] [t]herefore, they are a very important factor in determining the expenses." (Id. at 29.) Taylor explained:
 "The dilemma is that taxes affect value and value, in turn, affects the taxes. This is further complicated by the complexities of Measure 50. The important thing is to insure that the taxes used as an expense are consistent with the result of the valuation. This is done by iteration and the computation is in Appendix A[.]"
(Id.) In calculating the 2006-07 property tax expense, Taylor used the actual property tax paid on the 2005-06 assessed value and to that amount added a computed "exception value" property tax. (Ptf's Ex 2-37.) In computing the "exception value" property tax, Taylor used an improvement value at 100 percent complete of $4,900,000. (Id.) In response to questioning, Taylor stated that the improvement value was incorrect; the correct improvement value was $4,720,000. Taylor's computed property tax expense was $168,369. (Id.)
After deducting expenses and property taxes from effective gross income, Taylor determined a net operating income of $974,691. (Id. at 29.) Next, Taylor determined a capitalization rate. (Id.) Taylor relied on the five comparable sales used in his sales comparable approach, showing capitalization rates that ranged from 5.51 to 7.44 percent. (Id. at 29, 30.) Taylor's appraisal report stated that "[s]ince the subject property is new and the income is analyzed using actual income data, a relatively low capitalization, 0.55, rate is used." (Id. at 29.) Using a capitalization rate of 5.5 percent, Taylor determined a "value as complete and occupied" of $17,721,655. (Id. at 30.)
Taylor testified that "[t]he gross income multiplier is a factor that can be used to measure the value of apartments and other income producing property. * * * [i]t is different than the income approach because it considers only gross income, not expenses or vacancy." (Id.) Using the same five comparable sales, Taylor computed a gross income multiplier for each comparable *Page 12 
property: "the relationship or ratio between the sale price or value of the property and its gross income from rent and other income sources." (Id.) (citation omitted.) Taylor's computed gross income multipliers ranged from 7.86 to 9.48, concluding that 9.25 was the best gross income multiplier. (Id. at 32.) Taylor multiplied 9.25 times the total potential gross income ($1,986,110) to determine an indicated value of $18,371,521. (Id.) In response to questions, Taylor disputed that the gross income multiplier is "customarily a sales approach rather than income approach," and stated that there is an "ongoing argument in the industry."
4. Reconciliation
Taylor testified that, after considering all methods, sales comparable approach, income approach and gross income multiplier, "the total value [land and improvements] of the improved property, as [100 percent] finished and occupied, is estimated to be: $18,000,000." (Id.) Taylor testified that, because Tax Lot 3600 was only 40 percent complete as of the assessment date, his determined real market value needed to be adjusted for the "absorption period." (Id. at 33.) He testified that absorption is the "loss of income when a property is being rented up." Taylor's appraisal report stated:
 "Using the 114 units as an indicator of absorption, we can prorate the absorption to a cost per unit and apply the total to the entire 208 units."
(Id. at 33.) Taylor testified that he computed the total loss of income for 114 units to be $612,717. (Id. at 34.) He subtracted the computed absorption amount from the indicated improvement value and multiplied that computed value by 40 percent to determine an improvement real market value of $1,642,913. (Id.) Gordon testified that "the 40 percent completion factor" should reflect absorption."
5. Cost Approach — Real Market Value
Taylor did not consider the cost approach. *Page 13 
Gordon's appraisal report states that she relied "solely on the Cost Approach[.]" (Def's Ex A-84.) Gordon testified that the cost approach "is most applicable when the improvements are new or proposed construction[,]" like Tax Lot 3600. (Def's Ex A-49.) Stating that "[t]he subject property includes 208 units configured in eight, 8-plex buildings and twelve, 12-plex buildings[,]" Gordon's appraisal report stated that "[a]ll buildings are uniform in construction and quality. Construction costs for the 208 units will be estimated from three sources, to include developer reported costs, comparable construction costs and Marshall Swift Valuation Service." (Id.) Referencing a report entitled VAMS II Combined Lumber — Consolidated, Fixed Asset Subledger, 302 Units/328,270 Sq Ft, December 2005, Gordon testified that "the developer" reported "total direct costs of $17,814,555 for the then-302 units. Subtracting those costs specific to site improvements and site/underground work, results in a building construction cost estimate of $16,299,241" or $53,739 per unit. (Def's Ex A-99, 49.) When asked if Gordon knew the source of the document or if she had additional information to support the costs stated on that document, Gordon testified that the document was in the "county's files" and she assumed it came from the developer. Johnson testified that she "could not verify" the "costs are actual." Plaintiff objected to Defendant's Exhibit A-99, stating a lack of foundation.
Gordon testified that she prepared a table setting forth the "construction costs obtained from area developers for [five] similar multifamily developments in the extended Willamette Valley region." (Def's Ex A-49.) Those five comparables were all built in 2006, ranging from 24 to 196 units. (Id. at 50.) Gordon concluded that within the range of $57.71 to $71.72 per square feet, "the cost comparables suggest a direct construction cost of about $60,000 to $64,000 perunit." (Id.) (emphasis in original).) *Page 14 
Gordon also developed a cost per square foot using data from Marshall Swift Valuation Service adjusted for "[a]pplicable Regional and Local multipliers of 1.05 and 1.06[.]" (Id.) She concluded a "cost estimate of $66,630 per unit[,]" or $72.34 per square foot. (Id. at 51.)
After considering all three cost amounts, Gordon concluded "a total direct cost figure of $63,000 per unit" or "$13,104,000 for the 208 units." (Id.)
Gordon testified that to the direct costs there are indirect costs and entrepreneurial incentive that must be considered and added to determine a total cost per unit. She testified that "[b]ased on the data available and market standards, indirect costs of 25.00% of direct construction costs" and an entrepreneurial profit of 10.00% of developmentcosts" must be added to direct costs. (Id. at 52, 53.) (emphasis in original).) Gordon testified that "10 percent entrepreneurial incentive is on the low side." Gordon concluded that because the property was new there was no "applicable depreciation" to deduct. (Id. at 54.) Her total cost was "$18,018,000 for the 208 apartment units." (Id. at 54.)
As of January 1, 2006, the parties agreed that 40 percent of the 208 units were complete. Using the cost approach, Gordon determined a real market value of $7,207,200 for the improvements of Tax Lot 3600 as of the assessment date. (Id. at iv.)
B. Tax Lot 3600 — Assessment date: January 1, 2007
Plaintiff requested an improvement real market value of $2,463,370 for tax year 2007-08. Plaintiff presented no evidence of real market value as of January 1, 2007, to support its requested improvement real market value. *Page 15 
Gordon's appraisal report states that she relied "solely on the Cost Approach[.]" (Def's Ex A-83.) As previously stated, Gordon determined a total cost of $18,018,000 for the 208 apartment units.
The parties agreed that as of January 1, 2007, 60 percent of the 208 units were complete.
Using the cost approach, Gordon determined a real market value of $10,810,800 for the improvements of Tax Lot 3600 as of the assessment date. (Id. at iv.)
C. Tax Lot 100 — Assessment date: January 1, 2006
Taylor's appraisal report stated a real market value as of January 1, 2006, for Tax Lot 100 of $1,531,098. (Ptf's Ex 2-2, 35.) Taylor testified that his determination of value was based on an analysis similar to that used to determine the real market of Tax Lot 3600 as of January 1, 2006. Taylor's appraisal report provided no additional information as to how he determined the real market value.
Gordon's appraisal report states that she relied "solely on the Cost Approach[.]" (Def's Ex B-76.) Gordon testified that the cost approach "is most applicable when the improvements are new or proposed construction[,]" like Tax Lot 100. (Id. at 39.) Stating that "[t]he subject property includes 18 units configured in three, 6-plex buildings[,]" Gordon's appraisal report stated that "[a]ll buildings are uniform in construction and quality. Construction costs for the 18 units will be estimated from two (sic) sources, to include developer reported costs[,]" comparable construction costs "and Marshall Swift Valuation Service." (Id.)
Referencing a report entitled VAMS II Combined Lumber — Consolidated, Fixed Asset Subledger, 302 Units/328,270 Sq Ft, December 2005, Gordon testified that "the developer" reported "total direct costs of $17,814,555 for the then-302 units. Subtracting those costs specific to site improvements and site/underground work, results in a building construction cost *Page 16 
estimate of $16,299,241[,]" or $53,739 per unit. (Def's Ex A-99; B-39.) When asked if Gordon knew the source of the document or if she had additional information to support the costs stated on that document, Gordon testified that the document was in the "county's files" and she assumed it came from the developer. Johnson testified that she "could not verify" the "costs are actual." Plaintiff objected to Defendant's Exhibit A-99, stating a lack of foundation.
Gordon testified that she prepared a table setting forth the "construction costs obtained from area developers for [four] similar multifamily developments in the extended Willamette Valley region." (Def's Ex B-39.) Those four comparables were all built in 2007, ranging from 6 to 16 units. (Id. at 40.) Gordon concluded that within the range of $99.93 to $114.94 per square feet, "the cost comparables suggest a direct construction cost of about $100,000 to $140,000 perunit." (Id.) (emphasis in original).)
Gordon also developed a cost per square foot using data from Marshall Swift Valuation Service adjusted for "[a]pplicable Regional and Local multipliers of 1.05 and 1.06[.]" (Id. at 41.) She concluded a "cost estimate of $128,360 per unit" or $93.63 per square foot. (Id.)
After considering all three cost amounts, Gordon concluded "a total direct cost figure of $120,000 per unit" or "$2,160,000 for the 18 units." (Id.)
Gordon testified that to the direct costs there are indirect costs and entrepreneurial incentive that must be considered and added to determine a total cost per unit. She testified that "[b]ased on the data available and market standards, indirect costs of 15.00% of direct construction costs" and an entrepreneurial profit of 15.00% of developmentcosts" must be added to direct costs. (Id. at 42, 43.) (emphasis in original).) Gordon concluded that because the property was new there was no "applicable depreciation" to deduct. (Id. at 44.) Her total cost was "$2,856,600 for the 18 apartment units." (Id.) *Page 17 
As of January 1, 2006, the parties agreed that 40 percent of the 18 units were complete. Using the cost approach, Gordon determined a real market value of $1,142,640 for the improvements of Tax Lot 100 as of the assessment date. (Id. at iii.)
D. Tax Lot 100 — Assessment date: January 1, 2007
Plaintiff presented no evidence of real market value as of January 1, 2007.
For this tax lot, Gordon's estimate of real market is based on her appraisal report determining a real market value as of January 1, 2008. A discussion of Gordon's appraisal report for Tax Lot 100 including the three approaches can be found in the court's decision titled VillageResidential LLC v. Clackamas County Assessor, TC-MD 090854B.
Gordon testified that as of the assessment date the subject property was 100 percent complete. Gordon concluded that "as improved, * * * the existing 18-unit development adequately meets the four criteria of Highest and Best Use of the subject parcel * * * as of the date of value[.]" (Def's Ex B-32.) In determining the land value of the .89 acre parcel, Gordon's appraisal report stated that she "conducted" a search for "similar size and zoned sites within the immediate Wilsonville and Clackamas County submarket[,]" but found none. (Id. at 34.) She identified "five comparable sales" of "similar size, zoning and highest and best use development potential[]" in the Portland area. (Id.) Gordon testified that she found comparable properties in size to the subject property because "a larger site is equivalent to a different property." Gordon wrote in her appraisal report that the five comparable sales ranged in size from .46 to 1.16 acres and the "price per unit" ranged from "$14,000 to $50,000 per unit" with an "overall average" of "[$]31,858 per unit." (Id. at 36.) She concluded that "[p]rimary consideration is given to the two highest indicators ($50,000 and $35,714) due to similar sizes and density." (Id.) "Based on the comparable sales and preceding analysis, a price per unit value of $35,000 per unit is *Page 18 
concluded for the subject property. Applied to the 18 allowed units results in a land value conclusion of $630,000." (Id.) (emphasis in original).)
Gordon testified that site development costs must be added to the determined raw land value. She stated that the subject property "benefitted from site development completed for the earlier phases" of the "master planned development." (Id. at 37.) As previously stated, Gordon testified that she concluded that only $4,213,409 of the total OSDs ($7,208,509) are allowable OSDs that can be allocated on a per unit basis ($13,952) and added to the raw land cost. (Def's Ex A-47.) Gordon's appraisal report stated that "[t]his figure [$13,952] is rounded up to $15,000 per unit. Based on the 18 units which comprise the subject of this analysis, the indicated site development cost is concluded at $270,000. (Def's Ex B-38.) (emphasis in original).)
Gordon combined the "`raw' land value" of $630,000 with the "site development costs * * * estimated at $270,000[,]" for a "total estimated [land] value of $900,000" or "$50,000 per unit * * * reflect[ing] what a developer would pay for `ready to build' land, independent of costs associated with buildings and proposed occupancy." (Id.)
Using the cost approach, Gordon's determination of real market value of Tax Lot 100 improvements as of January 1, 2007, was the same as January 1, 2008: $2,856,000. (Def's Ex B-44, 70.) Gordon concluded that "substantial supportive weight is assigned to the Cost Approach." (Id. at 73.)
Gordon stated in her appraisal report that "[g]iven the subject property is an income-producing property and is marketable separate from the adjacent phases, the Income Capitalization Approach is the most applicable method of valuation." (Id. at 74.) Gordon described the income approach as follows: *Page 19 
 "Income is forecast based on actual figures as reported by the owner. Expenses are also based on owner-reported figures and are within market parameters. An OAR was extracted from the market and loaded to reflect the impact of property taxes (excluded as an expense item.) In the final analysis, primary weight is assigned to the Income Capitalization Approach."
(Id.) Gordon gave the income approach "primary weight" even though only" 11 of the 18 units were leased." (Id. at 70.) Because the rent in 2007 was less than that "achieved" one year later, "a revised proforma based on the lower rent [was] warranted. * * * The projected gross potential income is $317,688 * * * about three percent less than forecast for the following year." (Id.) (emphasis in original).)
One important difference in the income approach between tax years 2007-08 and 2008-09 was the capitalization rate. Gordon's appraisal report stated:
 "In recognition of the improving market conditions from this earlier date of value to the initial date of value, a slightly higher overall capitalization rate is warranted. For this earlier date of value, a market capitalization rate of 5.50% is used. The applicable tax code rate for that year was 1.82412 and the change property ration (sic) rate was 0.673. This results in a `loaded' capitalization rate of 6.7276%."
(Id. at 71.) (emphasis in original).) Gordon concluded that "[a]plying the overall loaded capitalization rate to the forecast net operating income results in a value indication of $3,298,620 rounded to $3,300,000" for land and improvements. (Id.) (emphasis in original).) Gordon determined a real market land value of $900,000 and when subtracted from $3,300,000 results in an improvement real market value of $2,430,000. (Id. at 74.)
Gordon's appraisal reports states that "given the lack of truly similar age and quality properties, supportive weight is assigned to Sales Comparison Approach. (Id.) Gordon concluded a "suggested range of value as of January 1, 2007[,] is $3,330.000 to$3,515,000" for land and improvements. (Id. at 73.) (emphasis in original).) *Page 20 
After reconciling the value determinations using the three approaches, Gordon's "final market value conclusion of the subject property, in fee simple, as of the January 1, 2007[,] date of value is:" $2,430,000 for improvements. (Id. at 74.)
E. Tax Lot 2400 — Assessment date: January 1, 2006
Taylor's appraisal report stated a real market value as of January 1, 2006, for Tax Lot 2400 of $548,040. (Ptf's Ex 2-2, 36.) Taylor testified that his determination of value was based on an analysis similar to that used to determine the real market of Tax Lot 3600 as of January 1, 2006. Taylor's appraisal report provided no additional information as to how he determined the real market value.
Defendant reminded the court that the real market value of Tax Lot 2400 was not appealed for tax year 2006-07.
F. Tax Lot 2400 — Assessment date: January 1, 2007
Plaintiff presented no evidence of real market value as of January 1, 2007.
Gordon testified that as of the assessment date Tax Lot 2400 was 100 percent complete. For that tax lot, Gordon's estimate of real market is based on her appraisal report determining a real market value as of January 1, 2008. A discussion of Gordon's appraisal report for Tax Lot 2400 including the three approaches can be found in the court's decision titled Village Residential LLC v. Clackamas CountyAssessor, TC-MD 090855B. (Def's Ex C.)
Gordon concluded that "as improved, * * * the existing six-unit development adequately meets the four criteria of Highest and Best Use of the subject parcel * * * as of the" date of value[.]" (Def's Ex C-33.) In determining the land value of the .42 acre parcel, Gordon's appraisal report stated that she "conducted" a search for "similar size and zoned sites within the immediate Wilsonville and Clackamas County submarket" but found none. (Id. at 35.) Gordon *Page 21 
testified that "size is very important." Gordon identified "five comparable sales" of "similar size, zoning and highest and best use development potential" in the Portland area. (Id.) Gordon wrote in her appraisal report that the five comparable sales ranged in size from .46 to 1.16 acres and the "price per unit" ranged from "$27,778 to $51,818 per unit" with an "overall average" of "$39,422 per unit." (Id. at 37.) She concluded that "[b]ased on the subject's small size and comparatively lower density of 14.29 units per acre, a high end figure is indicated." (Id.) "Based on the comparable sales and preceding analysis, a price per unit value of $50,000 per unit is concluded for the subject property. Applied to the six allowed units results in a land value conclusion of $300,000." (Id.) (emphasis in original).)
Gordon testified that site development costs must be added to the determined raw land value. She stated that the subject property "benefitted from site development completed for the earlier phases" of the "master planned development[.]" (Id. at 38.) As previously stated, Gordon testified that she concluded that only $4,213,409 of the total OSDs ($7,208,509) are allowable OSDs that can be allocated on a per unit basis ($13,952) and added to the raw land cost. (Id. at A-47.) Gordon's appraisal report stated that "[t]his figure [$13,952] is adjusted upward and concluded at $25,000 per unit. Based on the six units which comprise the subject of this analysis, the indicated site development cost is $150,000. (Id. at C-39.)
Gordon combined the "`raw' land value" of $300,000 with the "site development costs * * * estimated at $150,000[,]" for a "total estimated [land] value of $450,000, * * * reflect[ing] what a developer would pay for the land and site development, independent of costs associated with the buildings and proposed occupancy." (Id.)
Using the cost approach, Gordon's determination of real market value of Tax Lot 2400 improvements as of January 1, 2007, was the same as January 1, 2008: $1,159,200. (Id. at 72.) *Page 22 
Gordon concluded that "substantial supportive weight is assigned to the Cost Approach." (Id. at 75.)
Gordon stated in her appraisal report that "[g]iven the subject property is an income-producing property and is marketable separate from the adjacent phases, the Income Capitalization Approach is the most applicable method of valuation." (Id. at 75, 76.) Gordon described the income approach as follows:
 "Income is forecast based on actual figures as reported by the owner. Expenses are also based on owner-reported figures and within market parameters. An OAR [*****] was extracted from the market and loaded to reflect the impact of property taxes (excluded as an expense item.) In the final analysis, primary weight is assigned to the Income Capitalization Approach."
(Id. at 76.) Gordon gave the income approach "primary weight" even though as of the date of assessment "no units were rented[.] * * * The building remained vacant until one unit was leased in September 2007 and one in October 2007." (Id. at 72.)
One important difference in the income approach between tax years 2007-08 and 2008-09 was the capitalization rate. Gordon's appraisal report stated:
 "In recognition of the improving market conditions from the earlier date of value to the initial date of value previously concluded, a slightly higher overall capitalization rate is warranted. For this earlier date of value, a market capitalization rate of 5.50% is used. The applicable tax code rate for that year was 1.82412 and the change property ration (sic) rate was 0.673. This results in a `loaded' capitalization rate of 6.7276%."
(Id. at 73.) (emphasis in original).) Gordon concluded that "[a]pplying the overall capitalization rate to the forecast net operating income of $91,808 results in a value indication of $1,364,642 rounded to $1,365,000" for land and improvements. (Id.) (emphasis in original).) Gordon determined a real market land value of $450,000 and when subtracted from $1,375,000 results in an improvement real market value of $925,000. (Id. at 76.) *Page 23 
Gordon's appraisal reports states that "due to [the] lack of truly similar sales, the Sales Comparison Approach is given the least weight. Supporting weight only is given to the Sales Comparison Approach indicator." (Id.) Gordon concluded a "suggested value range from the Sales Comparison Approach, as of January 1, 2007[,] is $1,395.000 to $1,472,500" for land and improvements. (Id. at 75.)
After reconciling the value determinations using the three approaches, Gordon's "final market value conclusion of the subject property in fee simple, as of January 1, 2007[,] date of value is:" $925,000 for improvements. (Id. at 76.)
 II. ANALYSIS
The issue before the court is the 2006-07 and 2007-08 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments.See Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [3] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2) and OAR 150-308.205-(A)(2).
However, this court has previously concluded that real market value "assumes an active or `immediate' market by which value can be inferred from a number of transactions." *Page 24 Watkins v. Dept. of Rev. (Watkins), 14 OTR 227, 229 (1997). TheWatkins opinion continued, stating that "[r]arely is there a market for partially completed structures." Id. The court suggested that "statewide" data can be collected and compiled into cost factors that can be adjusted by the county assessor for local conditions.Id. Those factors can then be used to estimate the total cost of an improvement in a given location. Another equally satisfactory method is for the assessor to total the cost of the work completed as of the assessment date. Id . at 230.
A. Improvements — Less than 100 percent complete
The court follows its prior holding that the cost approach is "generally accurate for new construction" that is not 100 percent complete as of the assessment date. Watkins, 14 OTR at 229. For tax year 2006-07, the improvements on Tax Lots 3600 and 100 were 40 percent complete. For tax year 2007-08, the improvements on Tax Lot 3600 were 60 percent complete. Defendant's appraisal report included a determination of value using the cost approach. Using cost factors, Gordon concluded that the real market value of improvements on Tax Lot 3600 was $7,207,200 as of the 2006-07 assessment date and $10,810,800 as of the 2007-08 assessment date. (Def s Ex A-iv.) For Tax Lot 100, Gordon concluded that the real market value of improvements was $1,142,640 as of the 2006-07 assessment date. (Def s Ex B-2.)
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. ofRev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRev., 4 OTR 302 (1971)). This court has stated that "it is not enough for a *Page 25 
taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property."Poddar v. Dept. of Rev., 18 OTR 324, 332 (2005) (quotingWoods v. Dept. of Rev., 16 OTR 56, 59 (2002) (citation omitted). Plaintiff submitted no cost information.
Even though Plaintiff failed to carry its burden of proof and to then shift that burden to Defendant, this court "has jurisdiction to determine the real market value or correct valuation [of property] on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Defendant presented sufficient evidence, specifically cost factors, to support its determination of real market value for the subject property that was less than 100 percent complete as of the date of assessment.
B. Improvements that are 100 percent complete.
As of the 2007-08 assessment date, Tax Lots 100 and 2400 were 100 percent complete. As previously stated, Plaintiff has the burden of proof. For tax year 2007-08, Plaintiff presented no evidence of real market value. Plaintiff failed to carry its burden of proof.
Even though Plaintiff failed to carry its burden of proof and to shift that burden to Defendant, this court "has jurisdiction to determine the real market value or correct valuation [of property] on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.
Gordon concluded that for Tax Lots 100 and 2400 which were 100 percent complete as of January 1, 2007, "the Income Capitalization Approach is the most applicable method of valuation" because the "subject property is an income-producing property and is marketable separate from the adjacent phases." (Def' Ex B-74, Ex C-72, 73.) The court agrees with Gordon's conclusion. Gordon's net operating income was based on a forecast of "owner-reported" *Page 26 
actual income and expenses. (Def's Ex B-69; Ex C-76.) For Tax Lot 100, Gordon "revised" the proforma "based on the lower rent achieved" at the time of assessment. (Def's Ex B-70.) Gordon used the same capitalization rate including property tax of 6.7276 percent for each tax lot. The court concludes that Gordon's capitalization rate is at the low end of the range but supported by the subject property's recent completion and actual or potential net income.
Using the Income Capitalization Approach, Gordon determined a total real market value for the subject property. Because the issue before the court is the improvement real market value, the land real market value must be subtracted from the total real market value determined by Gordon.
1. Tax Lot 100
For Tax Lot 100, Gordon determined a land real market value of $900,000. (Def's Ex B-iii.) Gordon's land real market value was the sum of an estimated raw land real market value and on-site development costs. First, Gordon determined a raw land real market value of $630,000. (Id. at 36.) In making her determination, Gordon's appraisal report stated that "[p]rimary consideration is given to the two highest indicators ($50,000 and $35,714)." (Id.) However, Gordon appears to have given most weight to the low end, concluding "a price per unit value of $35,000." (Id.) That price per unit is $5,000 less than Taylor's "estimated value of subject per unit." (Ptf's Ex 2-13.) Taylor used the same price per unit for all tax lots.
The court cannot accept Gordon's raw land real market value. Even though she stated that she gave primary consideration to the two highest indicators, Gordon concluded a per unit value substantially less than one of the two "primary" indicators and slightly less than the lower *Page 27 
indicator. The court accepts Taylor's price per unit ($40,000), determining a land real market value for the 18 units of $720,000.
In determining the amount of on-site development costs that should be added to the land or improvements, the parties disagreed. Taylor concluded that all municipal development fees should be added to the raw land cost. Gordon concluded that some of the municipal development fees should be added to land and the balance of the fees should be added to improvements.
ORS 307.010(1)(b) defines "real property" to include the land itself as well as buildings, structures, and improvements. However, ORS 307.010, defining "real property," also separately defines land, as opposed to buildings, structures, improvements, and so forth.
ORS 307.010(1)(a) defines "land" as including, for assessment purposes, "site development[s]." ORS 307.010(1)(a) further states that "site development[s]" include "fill, grading, leveling, underground utilities, underground utility connections and any other elements identified by rule of the Department of Revenue." Under OAR 150-307.010(2)(a)(A), the Department of Revenue (the department) further defines "site developments" as "improvements to the land that become so intertwined with the land as to become inseparable." On-site developments, defined within the same rule, "are land improvements within the site which support the buildings or other property uses[,]" including such things as utility connections, water supply systems, and landscaping. OAR 150-307.010(2)(a)(A)(ii).
ORS 307.010(1)(a) and OAR 150-307.010(2)(a)(A)(ii) both specifically reference utility connections and, by rule, water supply systems. Defendant erroneously concluded that municipal development fees for sanitary sewers, water and surface water management were not includable on-site development costs. The sum of those three municipal development fees was $1,060,663. *Page 28 
Defendant did not allow zoning fees in the amount of $140,388, even though land development could not commence without payment of applicable zoning fees. The court concludes that zoning fees are an allowable on-site development costs. In sum, the court concludes that a total of $1,201,051 is allowable for on-site development costs for the 302 units, or $3,977 per unit. For the 18 units, an additional $72,000 (rounded) on-site development costs shall be added to Gordon's allowable on site development costs in the amount of $270,000.
The court concludes that the total land real market value for Tax Lot 100 for tax year 2007-08 was $1,062,000. Subtracting the court's determined total land real market value of $1,062,000 from Gordon's total real market value of $3,300,000, the court concludes that the improvements real market value for tax year 2007-08 was $2,238,000.
2. Tax Lot 2400
For Tax Lot 2400, Gordon determined a land real market value of $450,000. (Def's Ex C-iii.) Gordon's land real market value was the sum of an estimated raw land real market value and on-site development costs. First, Gordon determined a raw land real market value of $300,000. (Id. at 37.) In making her determination, Gordon concluded that the "high end figure" of $50,000 was appropriate, given the "subject property's small size and comparatively lower density of 14.29 units per acre." (Id.) That price per unit is $10,000 more than Taylor's "estimated value of subject per unit." (Ptf's Ex 2-13.) Taylor used the same price per unit for all tax lots. The court accepts Gordon's raw land real market value.
To Gordon's raw land real market value, on-site development costs in the amount of $150,000 were added for a total land real market value of $450,000. (Def's Ex C-39.) Based on the previous on-site development analysis for Tax Lot 100, the court concludes that Gordon's *Page 29 
land real market value should be increased $23,000 (rounded) for allowable municipal development fees for the six units.
The court concludes that the total land real market value for Tax Lot 2400 for tax year 2007-08 was $473,000. Subtracting the court's determined total land real market value of $473,000 from Gordon's total real market value of $1,375,000, the court concludes that the improvements real market value for tax year 2007-08 was $902,000.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. The court's determination of the subject property's real market value is based on Defendant's testimony and written evidence adjusted as stated above. Now, therefore,
IT IS THE DECISION OF THIS COURT that the real market value of improvements identified as Account 05008964 (Tax Lot 100) for tax year 2006-07 is $1,142,640.
IT IS FURTHER DECIDED that the real market value of improvements identified as Account 05003168 (Tax Lot 3600) for tax year 2006-07 is $7,207,200.
IT IS FURTHER DECIDED that the real market value of improvements identified as Account 05008964 (Tax Lot 100) for tax year 2007-08 is $2,238,000.
IT IS FURTHER DECIDED that the real market value of improvements identified as Account 05003168 (Tax Lot 3600) for tax year 2007-08 is $10,810,800. *Page 30 
IT IS FURTHER DECIDED that the real market value of improvements identified as Account 05008987 (Tax Lot 2400) for tax year 2007-08 is $902,000.
Dated this ___ day of December 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron December 13, 2011. The Court filed and entered this documenton December 13, 2011.
[1] Even though the cited references to Defendant's Appraisal Report are to tax year 2008-09, Gordon's appraisal report stated that "[t]he preceding land value concluded as of the January 1, 2008 [,] date of value remains applicable" for the 2006-07 tax year. (Def's Ex A-84.)
[2] See Footnote 1.
[3] All references to the Oregon Revised Statutes (ORS) are to year 2005. Any applicable statutory changes are noted. All references to the Oregon Administrative Rules (OAR) are to tax year 2006, 2007. *Page 1